ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

LEIF DAUTCH (CABN 283975)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7534
FAX: (415) 436-7234
Leif.Dautch@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CYRIL HANNA,<br><br>Defendant. | **CASE NO. 22-CR-048-CRB**<br><br>UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO REVOKE DETENTION ORDER [ECF NO. 118]<br><br>Date: January 22, 2025 (Hearing)<br>Time: 10:00 a.m.<br>Court: Honorable Charles R. Breyer |

Defendant Cyril Hanna has been held to answer on a Form 12 petition alleging that on August 25, 2024—while on federal supervised release for a firearm conviction—Hanna and an accomplice committed an armed robbery of three victims, holding guns to the heads of two female victims and a male victim and threatening to shoot them. Not only did the Honorable Lisa J. Cisneros find, following a preliminary revocation hearing, that probable cause supports the allegations in the petition, but the Honorable Thomas S. Hixson also evaluated the charges and Hanna's criminal history and determined that he was a danger to the public and must be detained. ECF Nos. 110, 116.

Hanna's August 2024 armed robbery was just the latest in a long series of violent offenses for which Hanna has been arrested and/or convicted. His prior federal conviction arose from a 2021 incident in which Hanna was found with a loaded firearm after fleeing from police and crashing his

truck into parked cars and the front gate of a home. That was Hanna's second gun-related arrest since his March 2021 release from state prison, where he had served nine years for an armed robbery. In addition to that prior conviction for robbery with a firearm, Hanna has a juvenile adjudication for voluntary manslaughter, two separate arrests for murder, two other arrests for attempted murder, and still further arrests for assault with a firearm, robbery, and burglary. In fact, counting his recent arrest for armed robbery, Hanna has been arrested for a violent offense nearly every year that he has been out of custody since 2002.

Given that extensive criminal history, Hanna's repeated failures on pretrial supervision during his prior case (including being discharged from the very halfway house at which he now seeks to reside), and the current Form 12 posture, Judge Hixson reasonably determined that Hanna could not bear his burden under Federal Rule of Criminal Procedure 32.1 to prove by clear and convincing evidence that he was not a danger to the public. Since that order, the government's case has only grown stronger, with Judge Cisneros finding—on the basis of 35 video, audio, and photo exhibits presented at the preliminary revocation hearing—that Hanna committed the armed robbery and possessed a firearm. While this Court owes no deference to the magistrate's factual findings or legal conclusions, it should independently reach the same conclusion and order Hanna detained as a danger to the public. *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990) (in conducting de novo review of detention order, district court "is not required to start over in every case, and proceed as if the magistrate's decision and findings did not exist").

## BACKGROUND

### I. HANNA'S LONG AND VIOLENT CRIMINAL HISTORY

In July 2012, Hanna was sentenced to 12 years in state prison for second degree robbery with use of a firearm. ECF No. 83 (Presentence Investigation Report ("PSR")) ¶ 30. Hanna served nine years and was paroled from Salinas Valley State Prison in March 2021. That lengthy state prison sentence reflected Hanna's violent criminal history, which included a juvenile adjudication for voluntary manslaughter, two separate arrests for murder, two other arrests for attempted murder, and arrests for assault with a firearm, robbery, and firearm possession. *Id.* at ¶¶ 29, 34-46.

- 7/28/2002: juvenile adjudication for voluntary manslaughter (4 years in California Youth Authority)
- 10/25/2007: arrest for robbery and assault with a firearm
- 8/20/2008: arrest for attempted murder and robbery
- 7/18/2009: arrest for murder, five counts of first degree attempted murder, shooting at inhabited building, conspiracy, and participation in a criminal street gang
- 6/28/2010: arrest for murder
- 8/28/2011: arrest for carrying a concealed vehicle in a vehicle
- 7/11/2012: conviction for robbery with a firearm (12 years prison, served 9 years)
- 7/27/2021: arrest in Los Angeles for attempted armed burglary
- 11/18/2022: federal conviction for felon in possession of firearm (credit for 8 months served)

## II. <u>HANNA'S 2021 FEDERAL FIREARM CONVICTION</u>

Around 4:45 p.m. on August 28, 2021, San Francisco Police Officers were driving in a marked police car southbound on 3rd Street in the Bayview neighborhood of San Francisco. PSR ¶ 8. The officers observed a truck stopped at a red light at the intersection of 3rd Street and Kirkwood. Suddenly, the truck accelerated at a high speed and ran the red light. Officers followed the truck and attempted to initiate a traffic stop. The truck responded by increasing its speed to 45-50 miles per hour in a 25 MPH zone, and running through a stop sign. The officers activated their siren and overhead lights, but the driver of the truck still failed to yield. *Id.* The truck continued into the next intersection at Mendell Street and Jerrold Avenue without stopping or slowing down for the stop sign. The truck then made a left turn onto the 1500 block of Jerrold Avenue, which has a severe downward slope. The truck swerved out of control and careened into vehicles parked along the north curb of Jerrold Avenue. The truck jumped the curb, drove across the sidewalk, and crashed into the front gate of a residence. The truck suffered severe front end and undercarriage damage during the collision. *Id.*





The officers exited their patrol vehicle and approached the disabled vehicle. PSR ¶ 9. The driver and sole occupant of the truck, later identified as Hanna, began to climb out through the driver's side window. Officers ordered Hanna to exit the vehicle and lie flat on the sidewalk. Hanna was detained. *Id.* Hanna told officers he was on parole. *Id.* ¶ 10. They searched the truck and located a firearm on the floorboard directly below the cup holder. PSR ¶ 11. Officers inspected the firearm and determined that it was fully loaded, with a round inside the chamber. The firearm was a nine-millimeter Taurus GX4 handgun loaded with 9 nine-millimeter FC cartridges. *Id.*

Officers collected DNA swabs from both Hanna and the firearm. PSR ¶ 12. A comparative analysis conducted by the SFPD Criminalistics Laboratory found "very strong support" for a positive match between the DNA samples from Hanna and the Taurus firearm, with the chance of the major DNA profile coming from a random person being 1 in 22.2 billion. *Id.* Hanna pled guilty to a federal charge of being a felon in possession of a firearm.



## III. <u>HANNA'S FAILURES ON PRETRIAL SUPERVISION</u>

While that federal case was pending, Hanna continued his pattern of criminal conduct, refused to follow his conditions of release, and was remanded into custody multiple times for violations of pretrial supervision. Hanna originally was released to the New Bridge Foundation, where he was terminated within days for possessing drugs in the facility, jeopardizing not just his place in the program and his sobriety, but that of another resident. PSR ¶ 4. He was later taken into custody at Santa Rita Jail, where

he again was found with drugs, prompting state charges. *Id*. at ¶ 5. After a stint at Options Recovery during which Pretrial reported that Hanna was dismissive and not committed, Hanna moved into his girlfriend's apartment – a later search of which yielded distribution quantities of methamphetamine, indicia of drug dealing, and ammunition. *Id*. When granted a last chance at release to the halfway house (where he wants to go now), Hanna lasted two days at the facility before violating their security rules with another resident and getting kicked out. *Id*. at ¶ 6. He was again remanded into custody. ECF No. 79 (Judge Tse ordering Hanna remanded for violating halfway house rules).

## IV. HANNA'S INVOLVEMENT IN AUGUST 2024 ARMED ROBBERY

On December 23, 2024, Magistrate Judge Cisneros held a preliminary revocation hearing on the Form 12 allegations that Hanna committed an armed robbery and possessed a firearm in Concord, California on August 25, 2024. ECF No. 116. The government introduced 35 video, audio, and photo exhibits—and called Probation Officer Salvador Tinoco as a witness—all of which established probable cause that Hanna had committed both offenses. *Id*.

The evidence showed that police were called to a gas station in Concord around 1:45 p.m., where a male victim and two female victims reported that they had been robbed at gunpoint by two men. The male victim identified one of the men as Lavell Boyland, based on his prior interactions with Boyland and the fact that he had arranged to meet Boyland to purchase marijuana that day. However, when the male victim arrived at an apartment to meet Boyland, he instead was confronted by two men, one of whom held a gun to his head, told him to get on the ground, zip-tied his wrists and feet, and covered his eyes and mouth with duct tape. The men stole the victim's ring, earrings, and $2,500 from his pants pocket. The suspects also demanded to know the location of the victim's Cartier watch (valued at $30,000 and which the victim had posted photos of on social media days before). The victim told police that he feared for his life and was scared the suspects were going to kill him. The photos below (clockwise from top left, Gov't Exs. 9, 10, 11, 12, 17) show signs of a struggle, a zip tie, and roll of duct tape found by police inside the apartment where the male victim was bound and robbed, as well as duct tape found outside the apartment and the victim's injuries to his arm.












Boyland and Hanna then left the apartment and went to the victim's car, where the male victim's girlfriend and another woman were sitting in the car. Both Boyland and Hanna were armed with firearms and each placed his gun to the head of a female victim and demanded to know where the Cartier watch was. One of the suspects said, "Don't move. I'm going to shoot you," and another demanded that they open the trunk. One of the suspects reached under one of the female victim's legs, where she was hiding the expensive watch. As pictured in the surveillance screenshot below (Gov't Ex. 21), Hanna then opened up the trunk of the car, took out of five large bags belonging them and took them to a nearby car. Boyland and Hanna then fled, having stolen the watch, a ring, earrings, cash, computer, phone, and a necklace totaling approximately $42,000 in value.



Police were able to solve the robbery in part because Boyland dropped his phone when fleeing the scene. Officers obtained a warrant and searched the phone, confirming that it belonged to Boyland. During their review of the phone, officers located a phone number associated with Cyril Hanna in public records checks that was saved as "Cuz Hanna Han." The day before the robbery and the day of the robbery, there were 59 calls between Boyland and "Cuz Hanna Han." These phone calls between the two accomplices were captured in nine Government Exhibits introduced at the revocation hearing (Exhibits 27-35), with the first depicted at right. The last call was about one hour before the robbery, and there were no phone calls between the two after Boyland's phone was left at the scene.




Officers also found on Boyland's phone an unmasked photo of Hanna taken during a "Facetime"-style video conversation on the day of the robbery (Gov't Ex. 26 at right).




During the phone review, officers also located an Instagram account with the handle "nopumpfakintour". The account had several videos of Cyril Hanna tagged as "Hanna Han" and wearing the same unique black and white mask that one of the robbers can be seen wearing in surveillance footage of the August 25 robbery (Gov't Ex. 7 below).



Cyril Hanna CDL photo



Mask IG screenshot



Mask IG screenshot




HANNA HAN IG screenshot



Suspect 2 surveillance photo

Hanna was arrested on a Ramey warrant on September 10, 2024. He was not charged by the Contra Costa County District Attorney's Office at that time, and was transferred into federal custody on the Form 12 petition. Since his initial appearance in federal court, the government has spoken to a prosecutor at the District Attorney's Office, who stated that the office was waiting until Hanna's accomplice (Boyland) was also in custody so that both men could be charged together. Thus, the District Attorney's decision not to file charges immediately based on the *Ramey* arrest should be interpreted as a determination that the evidence was insufficient to support criminal charges, or that state charges are not forthcoming.

## ARGUMENT

## I. LEGAL STANDARDS

Pursuant to Rule 32.1(a)(6) of the Federal Rules of Criminal Procedure, a defendant charged with violating his or her conditions of supervised release has the "[t]he burden of establishing by clear and convincing evidence that the person will not flee or pose a danger to any other person or to the community rests with the person." In making that determination, a magistrate judge may look to the factors outlined in 18 U.S.C. § 3142(g): (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

## II. HANNA'S DANGER TO THE COMMUNITY & RISK OF NON-APPEARANCE

Given Hanna's extensive history of violence and failure on supervision, he cannot bear his burden of showing by clear and convincing evidence that he is not a danger to the public or a flight risk.

The allegations in the Form 12 are extremely serious, with Hanna alleged to have participated in a planned armed robbery of three individuals, including personally holding a gun to the head of a female victim. Not only does Hanna match the physical description of the second robber, but the cell phone and Instagram evidence provides significant corroboration for Hanna's involvement. The crime left the victims traumatized, thinking they were going to be killed. Nor is this offense an aberration. Rather, Hanna has been arrested for robberies with firearms three times before and served 9 years in state prison for an armed robbery conviction. And his dangerous crimes are not limited to robbery, with a juvenile adjudication for voluntary manslaughter, two arrests for murder, and other arrests for attempted murder and assault.

Nor can Hanna assure this Court that he will comply with any conditions of release proposed by his counsel. He has repeatedly shown that he is either unable or unwilling to abide by conditions of

supervision. After being paroled in March 2021 from state prison, he was arrested twice with guns in the first 6 months, with the second incident resulting in his federal conviction. While on pretrial release during that case, Hanna violated his conditions by possessing drugs at New Bridge, at Santa Rita Jail, and at his girlfriend's apartment. He was later kicked out of the halfway house for violating security rules. This was the basis of a government motion to remand, an evidentiary hearing before Judge Tse, and Judge Tse's ultimate ruling that Hanna had violated the rules of the halfway house, could not return there, and had to be remanded pending sentencing. ECF Nos. 76, 79, 80. This history shows Hanna's unsuitability for the halfway house, if they would even accept him given his prior discharge for violating their security rules. And of course, the August 2024 armed robbery occurred while he was on supervised release, with conditions that prohibited him from possessing a firearm or engaging in criminal conduct.

The government is sympathetic to Hanna's desire to be present for the birth of his child in late February, and the government has informed defense counsel previously that it is willing to negotiate a short-term release around that time, as it has done for events such as funerals and holidays. However, Hanna's recent violent conduct and repeated acts of possessing weapons, robbing people, and violating his supervision pose too great a danger for him to be placed on a permanent basis at the halfway house and prevent him from proving by clear and convincing evidence that he is not a danger to the public. He should be detailed pending further adjudication of his Form 12 petition.

DATED: January 15, 2025

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

*/s/ Leif Dautch*
LEIF DAUTCH
Assistant United States Attorney